# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **STEVEN HORTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action Number |
| **vs.** | ) | **3:16-cv-00578-AKK** |
| | ) | |
| **THE HILLSHIRE BRANDS** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Steven Horton brings this lawsuit against the Hillshire Brands Company pursuant to Title I of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101–12117, as amended by the ADA Amendments Act of 2008 (ADAAA), Pub. L. No. 110-325, 122 Stat. 3553. Horton alleges that Hillshire discriminated against him after he was diagnosed with hypertension during a routine pre-employment physical by suspending him until his condition was under control, and then by discharging him hours after he returned to work. Hillshire has now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, doc. 30, contending that Horton does not have a qualifying disability and, alternatively, that it did not discriminate against him on the basis of that disability. That motion is now fully briefed, docs. 30; 35; and 37, and ripe for

review. After careful consideration of the parties' briefs and the record, the court finds that Hillshire's motion is due to be granted.

## I. <u>STANDARD OF REVIEW</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, a party "opposing a properly supported motion for summary judgment . . . must set forth specific facts showing that there is a genuine issue." *Id.* at 256 (quotation omitted). However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255. Indeed, it is explicitly not the role of the court to "weigh conflicting evidence or to make credibility determinations." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996); *see also Anderson*, 477 U.S. at 255 (explaining "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

"[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d

1560, 1563 (11th Cir. 1989)).  Nor will "a . . . 'scintilla of evidence in support of the nonmoving party . . . suffice to overcome a motion for summary judgment.'" *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (quoting *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004)).  Instead, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment is appropriate.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## II.   FACTS

Horton accepted a position as a "shipping operator," a position primarily responsible for forklift operation, at a Hillshire plant in Florence, Alabama in August 2013.  Doc. 31-1 at 6, 8, 12.  Consistent with Hillshire's routine practice, Horton was required to successfully complete a post-offer physical examination prior to starting work.  *Id.* at 17, 62.

As an additional part of this initial screening process, Hillshire's medical department examined employees to ensure that they were physically able to perform their work duties.  Doc. 31-5 at 4, 7.  Hillshire's nursing staff was primarily responsible for making this determination, but an outside doctor, Dr. Gary Daniel, frequently performed the required post-offer physical evaluation.  *Id.* at 6–7; Doc. 31-6 at 3.  To the extent Dr. Daniel found that certain work

restrictions for an employee were necessary, he would communicate those restrictions to Hillshire so that the company could determine whether the employee could still perform her job duties. Docs. 31-4 at 23; 31-6 at 4–5. Additionally, Hillshire's nursing staff retained the ability to medically restrict employees based on chronic problems such as hypertension or elevated cholesterol levels regardless of Dr. Daniel's evaluation. Docs. 31-5 at 7; 31-7 at 3. Specifically, with respect to hypertension, Hillshire required forklift operators to maintain a blood pressure level of 159/99 or below before they could work. Doc. 31-4 at 13.

At his post-offer physical, Horton's blood pressure was in excess of Hillshire's guidelines, registering as 164/120 at best. Doc. 35 at 4. Dr. Daniel referred Horton to his primary physician for additional blood pressure testing, but cleared him to work as a "Shipping/Receiving Clerk," an administrative position distinct from Horton's "shipping operator" position which requires the operation of a forklift. Docs. 31-3 at 24; 31-6 at 4–5. Dr. Daniel testified that he would not have cleared Horton if he had known Horton would be operating industrial equipment, and would have placed him instead on pending status for Hillshire to determine whether Horton could still safely perform the essential functions of his job. *See* Doc. 31-6 at 4–5.

Based on Dr. Daniel's clearance, Horton reported to work as scheduled on September 6, 2013, where he submitted to an additional examination conducted by

a Hillshire nurse, Paula Mundi. Docs. 31-1 at 21; 31-7 at 6, 13–14. Among other things, Mundi took Horton's blood pressure, which measured, at best, 180/116. Docs. 31-1 at 21; 35 at 5. Based on this reading Mundi informed Horton that she could not clear him to work and referred him to a local community clinic for treatment. Doc. 31-7 at 6. Both Mundi and Horton's direct supervisor explained that Horton would need to control his blood pressure before Hillshire would clear him to operate forklifts. Docs. 31-1 at 26–27; 31-7 at 6, 14.

Around the same time, Human Resources Administrator Deanetta Goodloe reminded Horton of Hillshire's attendance policies, which the company initially disclosed to Horton during his orientation period. Docs. 31-1 at 18, 22–23; 31-3 at 25. After being sent home, Horton called and informed Goodloe that he had a doctor's appointment scheduled for September 10, 2013. *Id.* at 22–23. Hillshire's internal documentation subsequently reflects calls from Horton, related to his absences from work, on September 13, 16, and 17, with the most recent call indicating Horton expected to return to work on September 23, 2013. Docs. 31-3 at 9; 31-5 at 16; 31-10 at 5–73.

From September 10 until September 25, Horton remained under the care of an outside physician and, as explained above, properly followed Hillshire's attendance reporting policy. *See* Docs. 31-1 at 21–25; 31-9 at 18. That policy required employees to call and report any absences expected to last for a day or

longer.  Docs. 31-2 at 25–26; 31-3 at 25–26.  If the employee expected an absence to last for longer than one day, Hillshire required the employee to provide an expected return date and to call-in thereafter only if the employee was unable to return to work on the date provided.  Docs. 31-2 at 25–26; 31-3 at 26.  The attendance line was operated by an automated system that prompted employees to leave their names, employee identification numbers, and their expected return dates.  Docs. 31-1 at 18; 31-3 at 4, 8.  A Hillshire employee, usually Goodloe, would subsequently review the messages and maintain a record of absent employees in a call log. Doc. 31-3 at 4–5, 24.  Three consecutive days of unreported absences would result in termination, doc. 31-2 at 26, but the failure to properly report an absence, standing alone, would not trigger any action until Human Resources received notice of the absences.  Doc. 31-3 at 11.  Instead, the Human Resources Department relied on reports from supervisors to alert them to absent employees.  *Id.* at 11.  Hillshire then checked the call log to determine if the employee had properly complied with its attendance policy.  *Id.*

On or around September 25, 2013, Horton sought to return to work.  Docs. 31-1 at 24; 31-5 at 14, 16; 31-9 at 18.  However, when Hillshire checked his blood pressure, it registered at 160/110, still above Hillshire's requirements.  Docs. 31-5 at 14; 31-7 at 6–7.  As a result, the medical staff declined to clear Horton for work, and sent him home for a second time.  Doc. 31-1 at 25; 31-7 at 6.

Thereafter, the parties disagree on whether Horton properly complied with the attendance policy. Horton says he continued to call and report his absences, although he does not remember the phone number he used or the last date he called to report an absence. Doc. 31-1 at 28, 30, 34–35. In contrast, Hillshire's call log indicates that Horton failed to contact Hillshire after he was sent home again and that it next heard from Horton when he returned to Hillshire on October 14, 2013 with a note from his medical provider authorizing him to return to work. Docs. 31-1 at 15–16, 28; 31-10 at 5–73. That day, Horton's blood pressure registered as 138/94, within acceptable levels. Doc. 35 at 6. Accordingly, the medical department cleared Horton and allowed him to clock in. Docs. 30 at 16–17; 31-1 at 15, 29. Horton was on the job for approximately two hours before a manager in Human Resources sent him home, explaining that Hillshire would follow up with him later. Doc. 31-1 at 18–19, 31; 31-9 at 22. Horton called Hillshire the next day, as instructed, seeking an update with regard to his employment status. Doc. 31-1 at 18–19. It is apparent from internal communications following this call that Hillshire had developed no clear rationale for Horton's discharge, and that Hillshire was unsure of Horton's status based on his long-term absence from work. *Id.* at 19; Docs. 31-3 at 5–8; 31-9 at 22–23. Shortly thereafter, Hillshire informed Horton that it had discharged him based on his failure to follow its attendance policy. Doc. 31-1 at 19. This lawsuit followed.

## III.   DISCUSSION

"The ADA prohibits discrimination 'against a qualified individual on the basis of disability.'" *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016) (quoting 42 U.S.C. § 12112(a)).  To establish a prima facie case under the statute, the plaintiff must show that: "(1) she is disabled, (2) she was a 'qualified individual' [at the relevant time], and (3) she was discriminated against on account of her disability." *Id.*  As to the first prong, Horton concedes that he does not have a disability.  Instead, he is pursuing a regarded as claim, doc. 35 at 12, which does not require that the employee show that she is actually impaired.  *See Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015) (stating that one of the ways a plaintiff may qualify as "disabled" under the ADA is if she was "regarded as having . . . an impairment") (quotation omitted).

To satisfy the regarded as prong of the ADA definition of disability, the plaintiff need only establish that "'she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity,'" *Lewis v. City of Union City*, 877 F.3d 1000, 1011 (11th Cir. 2017) (quoting 42 U.S.C. § 12102(3)(A)), so long as the perceived impairment is not transitory or minor.  42 U.S.C. § 12102(3)(B); *see also Dulaney v. Miami-Dade Cty.*, 481 F. App'x 486, 489 & n.3 (11th Cir. 2012) (noting that under the ADAAA the plaintiff

may be "regarded as having a disability [without] . . . a showing that the employer perceived the individual to be substantially limited in a major life activity"). Indeed, when Congress enacted the ADAAA, "one of its purposes was to 'convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.'" *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014) (quoting 42 U.S.C. §12101 note).

To satisfy the second prong of the prima facie case, the plaintiff must show she is a qualified individual, i.e., that "'with or without reasonable accommodation, [she] can perform the essential functions of the employment position that [she] holds or desires." *Lewis*, 877 F.3d at 1012 (quoting 42 U.S.C. § 12111(8)). "'Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors.'" *Id.* (quoting *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005)). These factors include, among other things, the employer's judgment regarding essential job functions, any written job descriptions, work experiences of current and past employees, and the amount of time spent performing the function at issue. *See Samson v. Fed. Exp. Corp.*, 746 F.3d 1196, 1201 (11th Cir. 2014). "Although the employer's judgment is 'entitled to substantial weight in the calculus,' this factor alone is not conclusive." *Id.* (quoting *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1285 (11th Cir. 2007)).

The plaintiff satisfies the final prong of the prima facie case, that she was subjected to unlawful discrimination on account of her disability, by showing that the employer treated employees with a protected characteristic less favorably than others. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 52–53 (2003). Liability requires that "the protected trait . . . actually motivated the employer's decision.'" *Id.* at 52 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). The plaintiff may make this showing with direct evidence, that is "evidence which reflects a discriminatory . . . attitude correlating to the discrimination . . . complained of by the employee," *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (quotation omitted), or by circumstantial evidence that allows the fact-finder to infer the presence of the requisite discriminatory motive. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004).

If the plaintiff makes out a prima facie case, a presumption of discrimination attaches and the burden then shifts to the employer to "articulate a legitimate, non-discriminatory reason," for the adverse employment action. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004). At that point, to prevail, the plaintiff must show that the employer's proffered reason is merely "a pretext for discrimination." *Id.*

With this framework in mind, the court turns to the specific contentions in this case.[1] The analysis is in two parts. Section A addresses Horton's claim that Hillshire discharged him because of his disability. As explained below, the court finds that Horton has failed to establish a prima facie case or to show that Hillshire's articulated reason for his discharge was pretextual. Section B addresses the suspension claim Horton raises in his brief, finding that Horton failed to plead such a claim, and that, in any event, the record supports Hillshire's contention that Horton's untreated hypertension posed a direct threat to his safety and to the safety of others.

## A. Whether Hillshire Violated the ADA by Terminating Horton

Hillshire challenges the first and third prongs of the prima facie case, contending that, as to the first prong, Horton has not shown that Hillshire regarded Horton as disabled and that, as to the third prong, Horton has failed to show that Hillshire discriminated against him on account of his perceived disability.

### 1. Did Hillshire Regard Horton as Disabled

Hillshire challenges the regarded as prong of the prima facie case on two grounds: (1) that it did not view Horton as disabled because its employees believed

---

[1] In addition to challenging his discharge as pleaded in his complaint, Horton also argues in his brief that Hillshire's failure to clear him for work until his hypertension was controlled constituted discrimination. Doc. 35 at 12, 17. Hillshire counters that Horton failed to plead such a claim in his complaint. Doc. 37 at 5. The court agrees. However, as explained in Section B *infra*, this claim fails even if Horton was allowed to amend his complaint at this late juncture.

Horton could resume a normal work schedule after receiving treatment; and, relatedly, (2) that an employee perceived as having only "a temporary incapacity to perform the essential functions of a job is not perceived as 'disabled.'" *Sutton v. Lader*, 185 F.3d 1203, 1209 (11th Cir. 1999). These arguments fail in light of the newly expanded definition of disability provided under the ADAAA. As the Eleventh Circuit explained, a plaintiff need only establish that she "has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Lewis*, 877 F.3d at 1011 (quotation omitted); *see also Wolfe v. Postmaster Gen.*, 488 F. App'x 465, 468 (11th Cir. 2012) (explaining that "[b]ecause of [the] amendment, a plaintiff need demonstrate only that the employer regarded [her] as being impaired, not that the employer believed the impairment prevented the plaintiff from performing a major life activity"). Therefore, because Hillshire knew Horton had hypertension and took action to bar Horton from working until he controlled his medical condition, Horton has established that Hillshire regarded him as disabled.[2]

---

[2] In its reply briefing, Hillshire seeks to avoid this straightforward analysis by relying on an Eighth Circuit opinion, *Morriss v. BNSF Railway Co.*, 817 F.3d 1104 (8th Cir. 2016), to argue that hypertension is an unprotected physical characteristic rather than "a physiological disorder or condition." *Id.* at 1109. The *Morriss* court concluded that obesity was not a physical impairment because obesity standing alone constituted a mere physical characteristic unless evidence indicated the obesity resulted "from an underlying physiological disorder or condition." *Id.* The *Morriss* court relied on EEOC regulations which explained that "weight is merely a physical characteristic . . . unless it is both outside the normal range *and* the result of an

## 2. Did Hillshire Terminate Horton Based on Discriminatory Animus

The final prong of the prima facie case requires Horton to show that Hillshire discriminated against him by discharging him because of his disability. Hillshire contends that Horton has failed to carry his burden, noting the lack of any evidence that Hillshire treated non-disabled employees more favorably.[3]  Because Horton has only circumstantial evidence to support his claim, he must prove discrimination by showing that he "was subjected to an adverse employment action in contrast with similarly situated employees outside [his] protected class." *Wilson*, 376 F.3d at 1087.  Although Hillshire specifically challenged this prong of the prima facie case, *see* doc. 30 at 26–27, Horton never addressed it in his opposition brief.  In fact, Horton has not even attempted to present any evidence pertaining to purported comparators.  For example, he has not indicated that

---

underlying physiological disorder." *Id.* at 1112 (emphasis original).  In contrast, the EEOC regulations explicitly identify hypertension as a disability.  *See Toland v. Bellsouth Telecomms., LLC*, No. 1:15-CV-2441, 2017 WL 6380641, at *2, (N.D. Ga. Aug. 9, 2017) (citing 29 C.F.R. § Pt. 1630, App).  Moreover, post-ADAAA case law regularly accepts hypertension as a potential disability.  *See, e.g.*, *Lloyd v. Hous. Auth. of the City of Montgomery, Ala.*, 857 F. Supp. 2d 1252, 1263 (M.D. Ala. 2012).  Therefore, in the absence of controlling authority, the court declines to find that, as a matter of law, hypertension only qualifies as a physical impairment under the ADA if it is caused by a specific physiological disorder or condition.

[3] Hillshire also argues that the prima facie case fails because Horton never requested an accommodation, a fact that Horton concedes.  Doc. 30 at 27.  Indeed, an employer's "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made."  *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999).  However, Horton does not allege discrimination based on a failure to accommodate.  Therefore, his failure to request an accommodation is irrelevant to the court's analysis.

Hillshire treated employees with hypertension poorly, and has not presented evidence bearing on the treatment of similarly situated, non-disabled employees who also failed to comply with Hillshire's attendance policy. Moreover, the only information before the court bearing on Hillshire's treatment of employees with high blood pressure indicates that Hillshire did employ individuals with controlled hypertension to operate industrial equipment. Doc. 31-4 at 30. And, while Horton believes Hillshire ultimately discharged him because of his condition, it is undisputed that Hillshire initially allowed him an opportunity to control his blood pressure. *See* Docs. 31-1 at 26–27; 31-7 at 6, 14. Put simply, beyond Horton's bare assertion to the contrary, the record does not support a finding that Hillshire discriminated against Horton by treating him less favorably than similarly situated employees without hypertension.

The court recognizes that the failure to satisfy the *McDonnell Douglas* framework is not necessarily fatal to Horton's case. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (explaining that "establishing the elements of the *McDonnel Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion"). Instead, so long as Horton "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent," his claim will "always survive summary judgment." *Id.* In this context, "[a] triable issue of fact exists if

14

the record, viewed in a light most favorable to [Horton], presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)). There is no such evidence here. Indeed, Hillshire has produced unrebutted evidence that it employed individuals with controlled hypertension, doc. 31-4 at 30, and Horton has provided the court with no indication that he was ever targeted or harassed based on his perceived disability. The record instead reflects that Hillshire employees were generally supportive of Horton and expected him to return to work. Docs. 31-1 at 22–23, 26–27; 31-7 at 6.

The court recognizes that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Still, a plaintiff must, at a minimum, convey to the court how she believes she has satisfied this threshold requirement. *See, e.g.*, *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005) (explaining that a "plaintiff does not shift the burden to the defendant under *McDonnell Douglas* merely by stating that [she] was fired or treated unfavorably. *McDonnell Douglas* requires the plaintiff to establish a prima facie case" by connecting her termination to her disability). Here, Horton does not even address the issue and there is nothing in the record to suggest discrimination. *See Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000) (noting that "[a] plaintiff must show not merely

that the defendant's employment decisions were mistaken, but that they were in fact motivated" by discriminatory animus).  Therefore, in light of Horton's failure to establish a prima facie case via either the traditional method or through *Smith's* "convincing mosaic" standard, summary judgment is due on his discharge claim.

### 3. Horton has Failed to Show Hillshire Articulated Reason for Discharge was Pretextual

Alternatively, Horton's discharge claim fails because Hillshire has rebutted Horton's prima facie case, if any, by "articulating a legitimate, non-discriminatory reason for the adverse employment action," i.e., that it discharged Horton based on his failure to comply with the attendance policy. *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009).  To survive summary judgment then, Horton must "either directly . . . persuad[e] the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.  Horton must present enough evidence "'to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).  This showing of pretext may also be established via a demonstration of "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find

them unworthy of credence.'" *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont De Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc)).

Horton raises several arguments related to pretext which the court will resolve next. However, before doing so, the court first addresses Horton's arguments bearing on the admissibility of the key documentary evidence in support of Hillshire's articulated reason for discharge, the call log. Horton argues that the call log is inadmissible because Hillshire produced it "well into the litigation" and the electronic copy has a last modified date of March 28, 2017. Doc. 35 at 5–6. Horton is correct that evidence filed in support of a motion for summary judgment must either be admissible at trial or reducible to an admissible form. *Macuba v. Deboer*, 193 F.3d 1316, 1322–23 (11th Cir. 1999). Rule 901 of the Federal Rules of Evidence requires the proponent of a piece of evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." The Eleventh Circuit has interpreted this language to require only the presentation of "sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be." *United States v. Caldwell*, 776 F.2d 989, 1001–02 (11th Cir. 1985). In other words, Rule 901 is satisfied with the existence of "only some competent evidence in the record to support authentication." *United States v. Elkins*, 885 F.2d 775, 785 (11th Cir. 1989). Here, Hillshire's representative, Sandra Zubik, testified that the call log was the true and correct document at issue.

Doc. 31-10 at 2–3. This testimony suffices to establish a prima facie case of authentication, and accordingly the log is properly before the court.

### a. Horton's Purported Compliance with the Attendance Policy is Insufficient to Establish Pretext

Turning to Horton's contentions related to pretext, Horton primarily challenges Hillshire's contention that he violated the attendance policy, arguing that a question of material fact exists on this issue in light of his testimony to the contrary. Although some dispute exists over the extent of Horton's compliance with this policy during September 2013, the parties generally agree that Horton properly reported his absences during most of September. At issue here is the period from September 25, 2013 to October 14, 2013, when the uniform testimony from Hillshire employees and the company's log documenting attendance related calls, *see* doc. 31-10 at 5–73, indicate that Horton failed to report his absence from work.

While normally Horton's statement that he called in "every day" to report his absences during the contested interval, doc. 31-1 at 28, 34, would likely be sufficient to create an issue of fact, Horton has offered no evidence supporting his position or that refutes Hillshire's records. "'When documentary evidence 'blatantly contradicts' a plaintiff's account . . . a court should not credit the plaintiff's version on summary judgment.'" *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) (quoting *Witt v. W. Va. State Police*, 633 F.3d 272, 276–77

(4th Cir. 2011)); *see also Johnson v. Niehus*, 491 F. App'x 945, 949 (11th Cir. 2012) (explaining that a court need not credit self-serving evidence "which is blatantly contradicted by the record, so that no fair-minded jury could believe it") (quotation omitted); *Vicks v. Knight*, 380 F. App'x 847, 852 (11th Cir. 2010) (affirming summary judgment because "a reasonable factfinder could not believe" the non-movant's assertions that were "contradicted by all of the relevant evidence, with the exception of his own affidavit"). Relevant here, Horton's testimony about complying with the attendance policy is entirely devoid of detail. For example, he could not recall communicating with anyone at Hillshire or calling in to the attendance line after September 25, 2013, he could not remember the date of the last time he called Hillshire to report an absence, and he provided his attorney with a timeline of events indicating he last called in to report an absence on September 18, 2013. Doc. 31-1 at 18, 28, 30, 34–35. Horton was also unable to recall the phone number he used to call the attendance line, *id.* at 34–35, and he has not produced telephone records substantiating those calls. *Id.* at 28. In other words, Horton has failed to present any evidence specifically indicating that he did, in fact, comply with Hillshire's attendance policy. His testimony alone, in light of the contrary documentary evidence, "does not meet [his] burden of producing some defense to a summary judgment motion." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (quotation omitted); *see also Ellis*, 432 F.3d at

1326 (explaining that "unsupported factual allegations are legally insufficient to defeat a summary judgment motion").

Moreover, as Hillshire points out, regardless of whether Horton actually complied with the attendance policy, the Human Resources Department operated under the good faith belief that he did not properly report his absences. An employer "may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long *as its action is not for a discriminatory* reason." *Damon*, 196 F.3d at 1363 n.3 (emphasis in original) (quotation omitted). In other words, "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." *Id.* The undisputed evidence supports Hillshire's good faith belief that Horton violated an established work rule. Specifically, Horton testified that he never spoke to anyone when he called Hillshire to report absences during the disputed period, doc. 31-1 at 18, and that the only explanation he ever received for his discharge was that he had violated the attendance policy. *See Id.* at 19. Moreover, Hillshire employees uniformly testified that they never received any communications from Horton during the period at issue, an assertion supported by the call sheet documenting the attendance related calls received by Hillshire. *See* Docs. 31-3 at 28; 31-5 at 16; 31-10 at 5–73. While Hillshire's internal communication surrounding Horton's termination

suggests some confusion over his employment status, it does not indicate that Horton properly followed the attendance policy. *See* Docs. 31-3 at 5–10; 31-5 at 7–9, 16-17; 31-9 at 22–23. Put simply, for summary judgment purposes, Horton's contention that he called in each day does not establish that Hillshire lacked a good faith belief that Horton had, in fact, failed to comply with the attendance policy.[4]

### b. *The Confusion Regarding Horton's Employment Status Does Not Establish Pretext*

Horton argues that Hillshire's explanation for his discharge is pretextual because when he contacted Hillshire after he was sent home in October, the employee who maintained the call log, Deanetta Goodloe, told him that she thought he was already working. Doc. 31-1 at 18–19. But, Goodloe played no role in Horton's discharge, *see* docs. 31-3 at 6; 31-12 at 2–3, and her statements are stray remarks at best. Moreover, based on the record, it is not surprising that Goodloe was initially unaware of Horton's employment status. The undisputed evidence is that Hillshire did not monitor the call log to identify absent employees who failed to comply with the attendance policy. Doc. 31-3 at 11. Instead, personnel from Human Resources only examined the call log when an employee's

---

[4] Horton also argues pretext based on purported shifting explanations he received for his discharge. This contention is based on Hillshire explaining to Horton that it discharged him due to his lack of attendance, without referencing his failure to comply with the call-in requirement of the attendance policy. *See* Doc. 35 at 18. However, this is a distinction without a difference. Horton failed to attend work for well over the allotted maximum of three days. Although he had a medical reason for doing so, he failed to call-in as required for his absences to be excused. In other words, Horton was discharged based on his lack of attendance in conjunction with his failure to comply with Hillshire's policy for reporting those absences.

absence was reported by a supervisor or another employee. *Id.* In other words, unless someone flagged the issue for Goodloe, she would have assumed that Horton had returned to work after September 25, 2013, the last day Horton called in to report an absence.[5]

### c. The Delay in Articulating a Reason for the Discharge Does Not Establish Pretext

Horton argues next that Hillshire's decision to wait several days to provide him with an explanation for his discharge is evidence of pretext. Doc. 35 at 18–19. The documentation, however, reflects that Hillshire formally discharged Horton on the day after it asked him to leave work, doc. 31-9 at 29, and shortly after email records indicate Horton called to inquire about his employment status. *Id.* at 22–23. Horton is correct that the email chain after this call indicates continued confusion, and also suggests Hillshire believed that his blood pressure was still too high to operate a forklift. *Id.* at 22. But, the emails do not directly address the discharge; they simply show Human Resources attempting to gather information on Horton's employment status based on the information known to them at the time. *Id.* at 22–23. Moreover, none of the emails reflect the involvement of the individual who discharged Horton or otherwise address the reason for his

_____

[5] For the same reasons, that Horton worked for several hours before Hillshire sent him home does not suggest pretext. At most, the evidence suggests that Human Resources operated inefficiently since it needed the two hours to determine that Horton had not reported being absent from work between September 25 and October 14 and then to react to that information. There is no basis to conclude, however, given the undisputed evidence regarding the administration of the attendance policy, that the delay in enforcement of several hours suggests pretext.

discharge. *Id.*; *see also* Doc. 31-12 at 2–3. The emails certainly indicate that Human Resources was not as efficient as it could have been and that employee information was not quickly exchanged between senior management and other employees. However, the emails provide no support for Horton's contention that he complied with the attendance policy. The fact that Human Resources failed to communicate effectively with Horton is not actionable under the ADA, *see Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (explaining that the court's "sole concern is whether unlawful discriminatory animus motivate[d] the decision") (quotation omitted), and none of the issues identified by Horton have any bearing on the existence of discriminatory animus.

Ultimately, there is no circumstantial evidence in the record supporting an inference that, after explicitly providing Horton with an opportunity to control his high blood pressure, Hillshire subsequently discharged him on the basis of that same condition. Horton has produced nothing, "outside of his own conclusory say-so," that would support such a conclusion. *See Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1337 (11th Cir. 2015). While Hillshire's "ham-handed" treatment of Horton could lead to the conclusion that the discharge "may have been a pretext of *something*," there is no evidence that the underlying factor motivating the discharge was Horton's perceived disability. *Id.* at 1337–38. Accordingly, because Horton has failed to "undermin[e] the legitimacy of [Hillshire's] proffered

reason" for discharging him, *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1346 (11th Cir. 2000), summary judgment is warranted on the discharge claim.

## B. Whether Hillshire Violated the ADA by Suspending Horton from Work

As the court has already noted, Horton's claim that Hillshire violated the ADA by suspending him from work until his blood pressure was controlled is not properly before the court because Horton failed to include that claim in his complaint. It is settled law that "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Indeed, to permit the plaintiff "to do otherwise would subject defendants to unfair surprise." *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005). This is especially true when, as here, the defendant did not have notice of the new theory. "Liberal pleading does not require that, at the summary judgment stage, [the] defendants must infer all possible claims that could arise out of facts set forth in the complaint," *Gilmour*, 382 F.3d at 1315, and this is not a situation where Horton has adequately pleaded a claim but miscategorized the legal grounds for relief. *See Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 964 n.2 (11th Cir. 1997) (explaining that the complaint need not properly categorize the precise legal theory giving rise to recovery to state a claim). Instead, Horton's complaint contains only a single count—"Termination Based on Disability." Doc. 1 at 3. To the extent Horton now

wishes to argue that his suspension also constituted a discriminatory adverse employment action, "[a]t the summary judgment stage, the proper procedure for [him] to assert a new claim is to amend [his] complaint in accordance with Fed. R. Civ. P. 15(a)." *Gilmour*, 382 F.3d at 1315.

Even if Horton had properly sought to amend his complaint pursuant to Rule 15, however, the court may still deny the amendment for a variety of reasons including if "the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant." *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007). This is precisely the case here where any proposed amendment would be futile. For the reasons stated below, the court finds that summary judgment on this newly proposed suspension claim, or existing claim—to the extent that the court has incorrectly read Horton's complaint—is also due to be granted.

### 1. Was Horton a Qualified Individual Entitled to ADA Protection

Hillshire argues that it suspended Horton because his hypertension prevented him from safely operating a forklift, and because he posed a "direct threat" to the health and safety of others in the workplace. Doc. 30 at 31–32. Horton does not contest that safe operation of a forklift was an essential function of his position. Instead he contends that Hillshire failed to rely on an individualized medical assessment of his capabilities before concluding that he posed a direct threat, and

that, because his hypertension was asymptomatic, he could safely operate a forklift

without posing a threat. *See* Doc. 35 at 12–17. The record belies both contentions

The ADA provides a defense to liability by allowing employers to impose

qualification standards "'shown to be job-related for the position in question and . .

. consistent with business necessity.'" *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S.

73, 78 (2002) (quoting 42 U.S.C. § 12113(a)). Among other things, qualification

standards may include the requirement "'that an individual shall not pose a direct

threat to the health or safety of other individuals in the workplace,' § 12113(b), if

the individual cannot perform the job safely with reasonable accommodation." *Id.*[6]

The EEOC regulations further provide that the employer's qualification standard

may also include a requirement that an individual shall not pose a direct threat to

his own health or safety, a requirement that the Supreme Court affirmed. *See id.* at

77–79. The direct threat defense "'must be based on a reasonable medical

judgment that relies on the most current medical knowledge and/or the best

available objective evidence, and upon an expressly individualized assessment of

---

[6] As mentioned previously, Horton did not request a reasonable accommodation, *see supra* n.3, and is not arguing now that he could have performed his essential job functions with an accommodation. He argues only that he was not a direct threat. Accordingly, the court does not consider the impact of potential accommodations on the direct threat analysis because Horton bears the burden of showing the availability of a reasonable accommodation that would allow him to perform his job functions without posing a danger to others. *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 836 (11th Cir. 1998). Moreover, no other accommodation, besides treatment of his condition, would remedy "the basic disparities between [the employee's] medical condition and the legitimate physical criteria for employment." *Myers v. Hose*, 50 F.3d 278, 282 n.2 (4th Cir. 1995) (finding that an employee with hypertension could not perform the essential functions as a bus driver even with reasonable accomodations).

the individual's present ability to safely perform the essential functions of the job, reached after considering . . . the imminence of the risk and the severity of the harm portended.'" *Lewis*, 877 F.3d at 1014 (quoting *Echazabal*, 536 U.S. at 86) (internal quotations omitted). In other words, at the heart of the direct threat inquiry is an attempt "to prohibit employers from making adverse employment decisions based on stereotypes and generalizations associated with the individual's disability rather than on the individual's actual characteristics." *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1097 (11th Cir. 1998). Consequently, "a good-faith belief that a significant risk of harm exists is insufficient if it is not grounded in medical or other objective, scientific evidence." *Lowe v. Ala. Power Co.*, 244 F.3d 1305, 1308 (11th Cir. 2001). Instead, the employer must have "made a reasonably informed and considered decision before taking an adverse employment action." *Id.*

The record supports a finding that Hillshire made a "reasonably informed and considered decision," *id.*, and did not act on "stereotypes and generalizations" associated with a disability when it suspended Horton. *See Prevo's Family Mkt.*, 135 F.3d at 1097. Hillshire made the decision based on two pre-employment medical examinations, and it is undisputed that the initial examination performed by an outside physician and a subsequent one by Hillshire's own nursing staff revealed dangerously high blood pressure readings. *See* Docs. 31-6 at 4–5; 31-7 at

6, 13–14.  Based on those readings, Hillshire's nursing staff sent Horton home to obtain proper treatment and to bring his blood pressure within Hillshire's guidelines for the safe operation of industrial equipment.  Docs. 31-1 at 26–27; 31-4 at 13; 31-7 at 6.  When Horton later sought to return to work, Hillshire medical staff took three separate blood pressure readings.  Doc. 31-7 at 6–8.  The lowest reading, 160/110, was still outside of Hillshire's safety guidelines, and, accordingly, Horton was again sent home.  *Id.*; Doc. 31-1 at 25.

From review of this evidence, it is apparent that Hillshire relied on individualized assessments of Horton's condition, the well-known and significant risks associated with that condition, and the particular requirements of Horton's job before suspending him.  This is simply not a case where Hillshire imposed restrictions based on an outdated or "cursory examination" or relied on the assessing physician's assumptions about the limitations caused by a particular impairment.  *See Lowe*, 244 F.3d at 1309.  Instead, Hillshire conducted the requisite specific assessment of Horton and his capabilities and relied on the reasonable judgment of its medical staff.  *See Lewis*, 877 F.3d at 1014.

Moreover, the evidence supports Hillshire's conclusion that Horton posed a direct threat.  The undisputed testimony from both parties' experts indicates that hypertension is a long-term illness that, without treatment, persists for years.  *See* Docs. 31-7 at 11; 31-8 at 7, 16.  Indeed, Horton had suffered from hypertension

for at least two years prior to applying at Hillshire. Doc. 31-8 at 6, 7. Critically, Horton's own expert suggests that hypertension poses potentially serious dangers, including stroke-like symptoms, heart attacks, and muscle weakness that cannot be predicted with certainty and can strike even asymptomatic individuals without warning. *Id.* at 16. This testimony, along with the demands of Horton's job, operating a forklift, doc. 31-1 at 57–58, establishes that the threat Horton posed was imminent, as Horton was at risk of experiencing symptoms at any time. Moreover, Horton does not dispute the severity of the danger he posed. Indeed, if he suffered any hypertensive symptoms at work—such as a stroke or a heart attack—the result could lead directly to the death or serious injury of Horton or other employees in the vicinity. In other words, the record supports Hillshire's contention that Horton's untreated hypertension posed a risk of extremely serious harm in connection with the performance of the essential functions of his job. *See LaChance,* 146 F.3d at 836 (finding direct threat when the plaintiff's potential "loss of consciousness was not only a danger to [the plaintiff], but due to the working environment, [a] danger to others as well").

Horton's argument that he never experienced any of these symptoms is not compelling, nor is his contention that he could have safely performed his duties. The employee's testimony alone is insufficient to satisfy his burden of demonstrating that he is not a direct threat. *See, e.g., Moses v. Am. Nonwovens.*

*Inc.*, 97 F.3d 446, 447–48 (11th Cir. 1996) (employee's testimony that he could safely perform a job was not enough to constitute "probative evidence that [the employee] was not a direct threat"); *see also Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 18–19 (6th Cir. 2012) (explaining that the plaintiff's testimony that he could sense the onset of symptoms before becoming incapacitated was insufficient to "defeat summary judgment" because it failed to show that the employer's judgment "was not reasonably based on an individualized inquiry into [the plaintiff's] condition"). Moreover, the medical evidence provides that a characteristic of hypertension is a lack of observable symptoms until the disease manifests itself through potentially deadly effects including heart attack and stroke. Doc. 31-8 at 16. Even Horton's expert admits that Horton's blood pressure, during the relevant time, was dangerously high and that there was simply no way to predict when he might become symptomatic. *Id.* at 9, 16. Additionally, there is no other evidence bearing on the propriety of Hillshire's blood pressure guidelines for its employees, and Horton's expert explicitly declined to comment on Horton's ability to work safely given his extremely high blood pressure. *Id.* at 11, 14–15.

Therefore, because Horton bears the burden of demonstrating that he was not a direct threat, *see LaChance*, 146 F.3d at 836, and the undisputed evidence weighs heavily in favor of Hillshire's assessment that an untreated Horton posed a direct threat in its workplace, Horton was not a "qualified individual" for ADA

purposes at the time Hillshire suspended Horton from work to seek further treatment for his hypertension. Accordingly, Horton's claim based on his suspension fails.[7]

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the court finds that Horton has failed to establish a prima facie case of discrimination or to rebut Hillshire's articulated reason for his discharge. Horton has failed to plead a discrimination claim based on his suspension or, in the alternative, to show that Hillshire failed to make a reasonably informed and considered decision that Horton was a direct threat before it suspended him. Accordingly, Hillshire's motion for summary judgment, doc. 30, is due to be granted.

**DONE** the 10th day of April, 2018.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

---

[7] The out of circuit cases relied on by Horton to suggest that summary judgment on the basis of direct threat is improper are uniformly inapposite as none of the decisions involve a direct threat analysis. The most relevant case, *Gillen v. Fallon Ambulance Service, Inc.*, 283 F.3d 11 (1st Cir. 2002), focused on whether an amputee was able to lift an adequate amount of weight to perform her essential job functions. *Id.* at 25. But, that case did not involve a direct threat defense and turned instead on whether the plaintiff was qualified for the position she sought. Moreover, unlike the facts before this court, the plaintiff in *Gillen* presented substantial evidence showing general fitness for the position at issue and was subjected to only a cursory medical screening that did not involve "an individualized examination of the effects of a known disability." *Id.* at 32. In contrast, Hillshire repeatedly conducted medical examinations of Horton and then acted based on the specific risks his condition posed in the context of his job.